UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| K-V PHARMACEUTICAL COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. |
| vs. ) | |
| ) | |
| CITIGROUP GLOBAL MARKETS INC., ) | JURY TRIAL DEMANDED |
| ) | |
| Defendant. ) | |

## COMPLAINT

COMES NOW Plaintiff K-V Pharmaceutical Company ("KV" or "Plaintiff"), by and through its undersigned counsel, as and for its complaint against defendant Citigroup Global Markets Inc. ("Citigroup" or "Defendant"), alleges as follows:

### PRELIMINARY STATEMENT

1. KV and its subsidiaries are primarily engaged in the development, acquisition, manufacture, marketing and sale of technologically distinguished branded and generic/non-branded prescription pharmaceutical products. KV is a public company with headquarters in St. Louis, Missouri.

2. In or around April 2005, KV opened a brokerage account with Citigroup for the purpose of managing certain cash reserves (the "Account"). When the Account was opened, KV provided Citigroup with its board-approved Investment Guidelines which required that all investments recommended by Citigroup comport with KV's conservative objectives of liquidity and capital preservation.

3. Between May 2005 and February 2008, Citigroup recommended that KV invest tens of millions of dollars in student loan backed Auction Rate Securities ("ARS")

- 1 -

as a suitable alternative to money market funds. Citigroup induced KV to invest in ARS by (a) touting itself as the recognized leader in the auction rate market; (b) falsely representing that ARS were safe and liquid investments that complied with KV's Investment Guidelines; (c) falsely representing that ARS were liquid even between auctions; (d) misleadingly deemphasizing investment risk by repeatedly representing that Citigroup never had a failed auction; (e) in the event of a failed auction, falsely representing that Citigroup would immediately rectify the failure, thereby ensuring liquidity for KV; and (f) in the event of a failed auction, falsely representing that the rate reset would be punitive for the issuer.

4. Citigroup, however, knew materially contrary facts about ARS, but failed to disclose this information to KV. For instance, Citigroup failed to inform KV that (a) ARS were in fact not suitable alternatives to money market funds; (b) ARS continuing liquidity was uncertain because it depended substantially, if not completely, on Citigroup artificially supporting the ARS market; (c) no real market for the ARS existed, and that most or all of the auctions for the ARS would be doomed to failure but for Citigroup's constant support of the ARS by regularly serving as buyers of last resort for the ARS; (d) the ARS would (and did) become illiquid if Citigroup ceased to support the ARS market; (e) Citigroup imposed internal limits on the amounts of ARS that it was willing to hold in inventory; (f) KV would be unable to independently determine if auctions were clearing from normal marketplace demand or because Citigroup was propping up auctions through its own support bids; (g) Citigroup had no intention of rectifying failed auctions as a matter of course; and (h) in the event of a failed auction, the rate reset of the ARS might not adequately compensate KV for the illiquidity of the ARS.

5. Starting in or around August 2007, the credit crisis and other deteriorating market conditions adversely impacted the ARS market. Consequently, Citigroup's support bids increasingly filled the gap in demand for ARS, thus sustaining KV's impression that the ARS market was functioning. Unbeknownst to KV, however, Citigroup's ARS inventory grew significantly, requiring Citigroup to repeatedly raise its risk management limits on its ARS inventory.

6. From in or around August 2007 through February 2008, demand for ARS continued to erode and Citigroup's ARS inventory reached unprecedented levels. Unbeknownst to KV, Citigroup was internally questioning the viability of the ARS market and planning for widespread market failure. Citigroup placed its own interests ahead of KV's by intentionally and/or recklessly failing to inform KV of the increasing risks of owning or purchasing ARS.

7. On or about February 11, 2008, without warning and contrary to Citigroup's express representations to KV and inconsistent with the parties' three-year course of dealing, Citigroup stopped supporting the auctions for the ARS it sold to KV, thus rendering them illiquid. On or about April 18, 2008, Citigroup itself announced write-downs of $1.5 billion of ARS inventory due to failed auctions and deterioration of the credit markets.

8. As a direct result of Citgroup's conduct, KV now holds approximately $72 million of ARS which, if liquid at all, can be sold only at a material discount to par value. Holding $72 million of illiquid ARS exacerbates KV's current cash crisis, which is requiring KV to seek borrowed capital and engage in overall cost-cutting by, among other things, eliminating approximately 700 jobs.

## THE PARTIES

9. KV is a corporation organized and existing under the laws of Delaware, with its principal offices in St. Louis, Missouri.

10. Citigroup is a corporation organized and existing under the laws of New York, with its principal offices in New York, New York. Citigroup is registered with the U.S. Securities and Exchange Commission and the State of Missouri as a broker-dealer engaging in a full service securities business, including retail and institutional sales, investment banking, trading, and research. At all times relevant hereto, Citigroup was registered with Missouri's Secretary of State as a business in good standing.

## JURISDICTION AND VENUE

11. The Court has subject matter jurisdiction pursuant to (a) 28 U.S.C. § 1331 because this action arises, in part, under 15 U.S.C. § 78j(b); and (b) 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000, exclusive of costs and interest, and complete diversity of citizenship exists between the parties.

12. Venue is proper in this judicial district pursuant to (a) 13 U.S.C. § 1391 because substantial parts of the events or omissions giving rise to the claim occurred in this district; and (b) 15 U.S.C. § 78aa because Defendant transacts business in this district.

## FACTS COMMON TO ALL COUNTS

A.  **Overview of the Auction Rate Securities Market**

13. ARS are investment vehicles, typically with a 20-30 year maturity, with interest rates or dividend rates that reset through bidding at predetermined intervals. There are two types of ARS – debt and preferred stock. The ARS market is comprised of

auction rate bonds, including municipal auction rate bonds and student loan auction rate bonds; auction rate preferred securities issued by closed-end mutual funds; and collateralized loan obligations and collateralized mortgage obligations.

14. The interest or dividend rate on ARS is reset periodically to the market rate through a Dutch auction which is conducted by an auction agent (typically a large broker-dealer or bank selected by the issuer). Broker-dealers submit bids on behalf of current and prospective investors to the auction agent, and, based on the submitting bids, the auction agent will set the next interest rate by determining the lowest rate to clear the total outstanding amount of ARS by matching buyers with sellers.

15. If there are insufficient bids to cover the ARS for sale – *i.e.*, more supply than demand – the auction fails. If an auction fails, the issuer pays a maximum or "punitive" interest rate, which either is a predetermined flat rate or a rate set by a predetermined formula identified in the prospectus or other disclosure document. The maximum interest rate may be higher or lower than the prior auction rates or the rates available on similar securities of similar credit quality and duration in the marketplace.

16. The frequency of the periodic auctions varies, with common reset periods being 7 days, 28 days, and 35 days. Because the rate ordinarily is reset frequently, the coupon is expected to move in relation to money market rates for instruments with a maturity of the relevant reset period and similar credit quality.

17. According to Citigroup, Inc.'s Form 10-Q filed August 1, 2008:

> Where insufficient orders to purchase all of the ARS issue to be sold in an auction were received, the primary dealer or auction agent would traditionally have purchased any residual unsold inventory (without a contractual obligation to do so). This residual inventory would then be repaid through subsequent auctions, typically in a short time

frame. Due to this auction mechanism and generally liquid market, ARS have historically traded and were valued as short-term instruments.

### B. Auction Rate Securities Backed by Student Loans

18. ARS backed by student loans – which are the securities at issue in the instant action – are either issued by trusts whose only significant assets are portfolios of student loans, or directly by a state authority. In both cases, the only collateral related to the ARS is the underlying portfolio of student loans. The proceeds from the issuance of ARS are used to purchase student loans.

19. The student loans underlying the ARS may be guaranteed by the Federal government, as were the student loans underlying the ARS sold by Citigroup to KV. ARS backed by these loans are viewed as having very low default risk and thus very low risk of credit downgrades.

### C. Citigroup's Role in the Auction Rate Securities Market

20. Citigroup marketed ARS to public and private issuers as an attractive way to obtain financing because ARS are long-term obligations that re-price using short-term, typically more favorable, interest rates. Citigroup also marketed ARS to customers, including KV, as an investment that offered better yields as compared with money market funds.

21. Citigroup was the sole or lead broker-dealer for the ARS it sold to KV. With regard to those ARS, it was Citigroup's practice to submit "cover bids" or "support bids" in all auctions to prevent auction failure. If Citigroup's cover bid was "hit," Citigroup would purchase for its inventory the amount of ARS necessary to prevent a failed auction. Citigroup would then try to sell the inventory in the secondary market

between auctions and submit sell orders for any ARS it still held at the next auction. According to Citigroup, Inc.'s Form 10-Q filed August 1, 2008, it "continued to purchase residual unsold inventory in support of the auction mechanism until mid-February 2008."

22. With regard to the ARS sold to KV, Citigroup received a fee from the ARS issuers for underwriting the ARS offering. Citigroup also received an annual fee from ARS issuers for remarketing the ARS as well as an auction dealer fee. For ARS that it held in inventory or placed with customers, including KV, Citigroup received higher fees than fees it received for other short-term instruments.

D. **KV's Brokerage Account with Citigroup**

23. On April 19, 2005, KV's investment committee convened a meeting in which Molly Peters (employed by Citibank), Michael Barnett (employed by Citibank) and Alice Neill (employed by Citigroup) participated telephonically. The objective of the meeting was for Alice Neill to present potential investments in ARS to KV. During this meeting, KV emphasized to Citigroup that its primary investment objectives were liquidity and preservation of capital. In response, Citigroup represented that (a) they were the largest dealer of ARS; (b) they hold substantial amounts of ARS in inventory; (c) as such, Citigroup will provide liquidity at all times, even between auctions; and (d) ARS are suitable alternative investments to money market funds. KV would not have purchased or held the ARS at issue but for Citigroup's representations.

24. On April 19, 2005, Alice Neill sent an email to KV with an attached document, entitled "Auction Rate Security Overview," which purported to "specifically outline[] the Auction Rate Securities Market." The Auction Rate Security Overview contained various materially false or misleading representations, including that:

- "Citigroup is the recognized leader in the auction rate market."

- "Investors can buy, sell or continue to hold securities at par at each auction."

- "To date, Citigroup has never been involved in a failed auction."

- Under the caption "Failed Auction Risk: The failed auction rate is intended to be a punitive level for the issuer and to compensate the investor for the lack of liquidity in the auction."

- Under the caption "Failed Auction Risk: Solutions will be immediately implemented in attempt to rectify the issue."

- Under the caption "Key Points: Citigroup has never had a failed auction."

25. KV would not have purchased or held the ARS at issue but for the representations in Citigroup's Auction Rate Security Overview.

26. In or around April 2005, Alice Neill visited KV's offices in St. Louis, Missouri. At that meeting, Alice Neill received KV's Investment Guidelines, which identified KV's investment objectives as (a) preservation of capital; (b) adequate liquidity at all times; and (c) maximized return subject to KV's Investment Guidelines and KV's tax situation. KV's Investment Guidelines also included a maturity schedule, which required that (a) all securities mature within 24 months from the original settlement date; (b) the average life of the portfolio shall not exceed 12 months; and (c) the greater of 10% of the portfolio or $20,000,000 shall mature within 30 days. Citigroup agreed to manage the Account and recommend investments in accordance with KV's Investment Guidelines and, but for that agreement, KV would not have purchased or held the ARS at issue.

27. Citigroup managed the Account on a *de facto* discretionary basis by purchasing ARS without first receiving KV's approval before every such transaction.

### (1) The ARS Market Deteriorates throughout 2007

28. In or around March 2007, the Financial Accounting Standards Board shifted its position with respect to the proper balance sheet treatment of ARS. Following the change, ARS were required to be classified on corporate balance sheets as "short term investments" instead of their previous designation as "cash equivalents." Certain corporate ARS holders reacted to the switch by selling ARS which, in turn, caused Citigroup to absorb additional ARS in inventory, thereby straining its own balance sheet.

29. Stress on the ARS market was known within Citigroup throughout 2007 but never disclosed to KV. Indeed, an internal email from Citigroup on November 1, 2007 acknowledged that "[s]ince the credit crisis hit this summer, the ARS market has been under pressure caused by investor risk aversion and other dealers' failed auctions…As a result, liquidity has been thin."

30. In August 2007, when concerns about ARS were heightened at Citigroup, internal documents provided to senior management discussed the implications if Citigroup were to stop supporting auctions. The documents stated, "Investors and issuers might believe that there is implied liquidity provided by Citi because we have marketed the fact that we have never had a failed auction as lead manager in twenty years," and also identified the risk of lawsuits.

31. Management at Citigroup also discussed the implications of failed auctions in a separate document, which stated: "Implied liquidity: bankers, salespeople and traders have implied the concept of liquidity provided by Citi for investors and

issuers for over 20 years." The document also identified "a risk of lawsuits initiated by thousands of retail investors, high net worth clients and institutional clients because Auction Rate Securities (ARS) have been marketed as 'money market alternatives' and 'liquid investments' for 20 years. The hundreds of ARS issuers may also seek litigation against Citi."

32. Citigroup never disclosed to KV that it marketed the ARS falsely by implying liquidity or that Citigroup feared litigation which could result from the misleading marketing. KV would not have purchased or held the ARS at issue had Citigroup disclosed these material facts.

### (2) Citigroup Fails to Advise KV that its Ability To Support the Auctions was Impaired

33. Prior to August 2007, Citigroup's inventory from supporting auctions ranged from approximately $1 to $2 billion, which was within the self-imposed balance sheet limit Citigroup allocated to purchase ARS to prevent failed auctions.

34. By August 2007, unbeknownst to KV, Citigroup's ARS balance sheet limits became strained and affected Citigroup's ability or willingness to purchase additional ARS. This, coupled with deteriorating conditions in the ARS market, prompted a Citigroup internal email, in mid-August 2007, stating that "there are definitely cracks forming in the market. Inventories are starting to creep higher in the market and failed auction frequency is at an all time high." Citigroup failed to disclose these material facts to KV.

35. By August 2007, Citigroup's short-term trading managers, and the heads of banking units that underwrote ARS, realized that without an increase to the inventory limit set for ARS, Citigroup could not purchase the ARS necessary to prevent auction

failure. Indeed, on August 16, 2007, management of Citigroup exchanged an email stating: "We need to discuss the current state of the auction market, our commitment to the auctions, its impact on our balance sheet and the effect of our actions on our clients…our actions will have broad-reaching implications to all of our constituents, the market, and our franchise." Citigroup failed to share these material facts with KV.

36. Unbeknownst to KV, the balance sheet limit for ARS ultimately was increased by Citigroup and it continued to support auctions. The balance sheet limit was increased additional times throughout the fall of 2007 and beginning of 2008 to accommodate Citigroup's ARS inventory, which increased from approximately $4 billion to more than $10 billion in February 2008 when Citigroup stopped supporting auctions.

37. Citigroup's balance sheet concerns caused it to step-up its efforts to reduce ARS inventory. For example, on August 30, 2007, an email to ARS traders stated: "Make sure you don't leave any stones unturned today. We are currently at our extended limit. Hit all bids….Times like these, we need to do whatever is necessary. Just make sure all hands are on deck and paper is sold."

38. Citigroup failed to disclose to KV that its inventory of ARS reached unprecedented levels, thus causing balance sheet stress for Citigroup. KV would not have purchased or held the ARS at issue had Citigroup disclosed these material facts.

39. Upon information and belief, Citigroup did not sell the ARS at issue to KV based on the merits of the investment. Rather, upon information and belief, at least since August 2007, Citigroup put its economic interests before KV's by selling ARS to KV in an effort to reduce Citigroup's ARS inventory and ease its balance sheet pressures.

(3) **Citigroup Placed its Interests Ahead of KV's By Underwriting and Selling New ARS Issues While Market Coditions Rapidly Deteriorated**

40. By August 2007, Citigroup recognized that supply exceeded demand in the ARS market, but nevertheless continued to increase the amount of ARS that Citigroup underwrote and marketed, thereby contributing to the inventory and balance sheet problems that threatened its ability to continue supporting the auctions. For instance, Citigroup still explored opportunities to take over ARS from other broker-dealers as those broker-dealers struggled in the deteriorating market.

41. Citigroup investment bankers also wanted to continue bringing new ARS to market, to earn fees and to maintain their position vis-à-vis bankers at other broker-dealers, despite the need to control the supply and inventory of ARS. Indeed, on or about November 1, 2007, Citibank underwrote the ARS offering for College Loan Corporation Trust I ("CLC") and sold same to KV pursuant to a prospectus which omitted material facts. Despite "cracks forming in the market" and Citigroup's "commitment" to the auctions in question, on or about November 1, 2007, upon Citibank's recommendation, and without disclosure of the material facts above, KV purchased $10,700,000 of CLC Series 2007 2A-10 Senior Notes and $16,900,000 of CLC Series 2007 2A-11 Senior Notes.[1] It was unconscionable for Citigroup to bring CLC to market at a time when Citigroup's ability to support CLC's auctions was impaired. KV, which still holds the CLC bonds, would not have participated in the CLC offering had Citigroup provided it with full and accurate risk disclosure.

---

[1] CLC's offering included a series of senior notes, numbered 1 through 14, which mature on November 1, 2047.